Filed 5/10/21  P. v. McCarter CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEVEN ANTHONY MCCARTER,<br><br>Defendant and Appellant. | C085161<br><br>(Super. Ct. No. 16FE002313) |

SUMMARY OF THE APPEAL

A jury convicted defendant Steven Anthony McCarter of two counts of rape of Gina Doe and one count of attempted rape of Rita Doe, and various assault charges arising from the same, including two counts of assault with a deadly weapon, to wit a belt on Gina and a bottle on Rita.  The jury also found true that defendant used a deadly weapon when he raped Gina.  At a bifurcated hearing, the trial court found true that

1

defendant had two prior serious felonies (strikes) and two prison priors. The trial court sentenced defendant to an indeterminate term of 115 years to life, with an additional consecutive term of 36 years to life for the prior strikes and prison priors.

In his opening brief, defendant makes five arguments. Arguments one and two, which we consider together, claim the trial court violated defendant's rights to due process and a fair trial by instructing the jury with a legally invalid theory that it could consider a belt or a bottle inherently dangerous weapons for purposes of determining if the rapes of Gina and the assault with a deadly weapon offenses were committed with deadly weapons. In his third argument, defendant argues the trial court violated his right to due process when it failed to instruct on the lesser included offense of simple assault along with the assault with a deadly weapon instruction for Rita. In his fourth argument, defendant argues that the trial court violated his right to due process when it allowed the jury to consider the Gina Doe rapes to find defendant was predisposed and inclined to commit sexual offenses when it considered whether he attempted to rape Rita. In his fifth argument, defendant argues we ought to order a limited sentencing remand to allow the trial court to determine if it wants to exercise its discretion to strike defendant's prior serious felonies under changes to the Penal Code that became effective after the judgment was entered by the trial court. In a sixth argument, raised in a supplement brief, which we consider in the same section we address defendant's fifth argument, defendant argues that we should strike six years from his sentence that were imposed due to the prison prior findings, because changes to the law made subsequent to the sentencing in this matter have eliminated the ability of courts to impose those sentencing enhancements.

We agree with defendant's sixth argument and strike the six-year portion of his sentence that are due to the prison prior enhancements. Otherwise, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

### *The Rapes of Gina Doe*

The facts recited here are based on Gina's testimony.

On the evening of November 20, 2015, Gina was homeless. She was alone and it was night. She was sitting on a curb when defendant stopped and asked her if she was okay. Defendant asked Gina to get into his truck, and she did. They went to a liquor store, and while she stayed in the car he went in and bought a beer for himself and a bottle of peach vodka for her. Next, he went through the drive through at a nearby McDonald's and bought her food. Defendant brought up the possibility of them having sex, but she said no.

They drove to a Motel 6. At the front desk, the staff copied Gina's and defendant's identifications. They went to a motel room, and she ate while defendant left for a bit. She had a couple shots of alcohol with her food. Defendant returned and went in the bathroom and took a shower. Gina fell asleep on the chair--or small couch--where she was sitting.

When Gina woke up, defendant was near her. He was leaning over her and seemed to be lifting her up. Defendant had one arm behind Gina's back and the other appeared to be choking her. Gina screamed. Defendant grabbed a belt and tried to put it around Gina's neck. Gina tried to prevent the belt from being tightened around her neck using her arm as a barrier, and the belt buckle broke, resulting in the belt swinging away from her neck. Defendant got mad and hit Gina in the face with his fist twice. He told her to "shut the fuck up," and to get up. Gina was afraid for her life; so, she got up. Defendant told Gina to take off her clothes. She said no, but he screamed at her with the belt in his hand, as if to swing it at her, and he was naked. She took her clothes off.

3

Defendant told Gina to get on the bed and counted to three loudly, and Gina got on the bed. He got on top of her, pushed her legs open, and entered her vagina with his penis, though it is possible his penis did not enter her vagina because she had her legs squeezed tightly together. She screamed, but he continued. He made her turn over onto her stomach and inserted his penis into her anus, but it would not stay. He then continued with his penis in her vagina.

Gina later fell asleep. In the morning, Gina woke up and took a bath. She dressed and grabbed her things. Defendant and Gina left at the same time, with him going towards his truck and her going across the street to call her ex-boyfriend and ask him to come pick her up.

Gina's ex-boyfriend picked her up and took her to her aunt's house. Her aunt asked Gina what had happened and took Gina to the hospital. Staff at the hospital performed a sexual assault exam on Gina, and she told them what had happened. Another of Gina's aunts came to the hospital, and Gina told her what had happened too.

Photos taken of Gina at the hospital show injuries from the assault to her eyes, neck, back, and arm.

*The Attempted Rape of Rita Doe*

The facts recited here are based on Rita's testimony.

During the day on January 21, 2016, Rita Doe was walking in the rain and carrying bags of groceries. She saw a car she thought was her cousin's and flagged down the driver, and it turned out the driver was not her cousin but the defendant. She apologized for the mistake but said she would appreciate a ride anyway. Defendant gave Rita a ride, and the two of them discussed meeting for a drink after he got off work later that night. At around 10 p.m., defendant called Rita and cancelled their plans.

Later that night, it was raining, and Rita went to catch a light rail train home from the Cosumnes River station, but it was 12:16 a.m. and the last train had left at 12:14 a.m.

4

Rita remembered defendant had said he gets off work late; so, she called him to ask for a ride. He picked her up at about 1:25 a.m.

They went to a gas station where defendant bought Rita a bottle of gin and himself a bottle of brandy. Defendant had been drinking and said he was too tired to drive to Rancho Cordova, where they both lived, and he asked if it would be okay if they got a hotel room. Rita told defendant she was not going to have sex with him, but it would be okay to get a room for the night if he promised to take her home in the morning. After checking with two other motels, they wound up getting a room at the third place they stopped. Defendant paid and they went to the room.

Rita went to take a shower, and defendant tried to get in the bathroom with her, but she pushed him out and told him no. She rinsed her pants out. When she got out of the shower, she put her shirt, bra, and underwear back on, and she placed her pants over a heater to dry. She sat down on the bed with a towel wrapped around the lower half of her body with a sweater covering her front where the towel could open, and defendant went to take a shower.

Defendant came out of the shower with only his boxers on, sat down next to Rita, and asked her why she had her clothes on. Rita told defendant it was because they were not going to have sex, and she was about to go to bed. He asked her to take off her shirt, and she said no. He made what seemed to her like an aggressive gesture and said something like, "I said take off your shirt . . . bitch you going to play me." He was angry, and asked her if she thought he was going to get the room for nothing, and indicated nothing in life is free. She said she could just leave and he hit her in the eye. He hit her in the face with what she believed was his brandy bottle. In all, she estimates he hit her in the face two to three times with his fist, and once with a bottle. Defendant ripped her shirt and bra in half. He tried to push her to a prone position and open her legs. His body was on top of hers. She had been scooting towards a nightstand where she had stashed a

5

pocketknife. She started stabbing him with her pocketknife, while he screamed, "she's stabbing me!"

After Rita stabbed defendant multiple times, he backed off enough to let her go. She got up and grabbed her stuff and put her wet pants on as well as she could. She also grabbed his car keys and some money to pay for transportation. She ran to the door while he was yelling for help, saying she had stabbed him and was robbing him. She ran to defendant's truck, thinking she could get in it and get away from the situation, but he came and stopped her. She went to her uncle's and told him what had happened.

Later in the day, she went to a law enforcement substation to report the incident, but they told her the incident was outside of their jurisdiction. Later, she went to University of California at Davis Medical Center (UC Davis Med Center) with breathing problems. Officers came to the hospital and wanted to speak with her about the incident. She tried to run away but an officer grabbed her.

Photos taken after the incident show injuries to Rita's face from the assault.

*The Charges*

The People filed a seven-count complaint on February 4, 2016, which was deemed an information on June 21, 2016, and amended on May 16, 2017.

The first four counts of the complaint arose out of the incidents involving Gina. Counts 1 and 2 charged defendant with two counts of forcible rape of Gina, pursuant to Penal Code section 261, subdivision (a)(2). (Unless otherwise indicated, citations to code sections are to the Penal Code.) Counts 1 and 2 further alleged that defendant "personally used a dangerous or deadly weapon or a firearm, to wit, a belt, in commission of the . . . offense in violation of Section 12022, 12022.3, 12022.5 or 12022.53, within the meaning of Penal Code Section 667.61(e)(3)." Count 3 charged defendant with the felony assault of Gina with a deadly weapon, specifically a belt, pursuant to section 245,

6

subdivision (a)(1). Count 4 charged defendant with the felony assault of Gina with force likely to cause great bodily injury pursuant to section 245, subdivision (a)(4).

The fifth through seventh counts arose out of the incidents involving Rita. Count 5 charged defendant with felony assault of Rita, pursuant to section 220, with the intent to commit rape pursuant to section 261, subdivision (a)(2). Count 6 charged defendant with the felony assault of Rita with a deadly weapon, specifically a bottle, pursuant to section 245, subdivision (a)(1). Count 7 charged defendant with the felony assault of Rita Doe with force likely to cause great bodily injury pursuant to section 245, subdivision (a)(4).

The People further alleged that defendant had been convicted of two prior serious felonies within the meaning of section 667, subdivision (a) (strikes), making him eligible for a three-strikes life sentence under sections 667, subdivision (e)(2), and 1170.12, subdivision (c)(2). Finally, the People also alleged defendant had two prior felony convictions for which he served prison terms then did not remain free or committed another felony offense within five years of his release (prison priors) as contemplated by section 667.5, subdivision (b).

*Additional Trial Testimony*

In addition to Gina and Rita, the People called other witnesses including Gina's aunt and ex-boyfriend; a nurse who examined Gina; a criminalist who tested DNA samples and matched a sample from Gina's anus with defendant's DNA profile; and members of law enforcement, including lead investigator Mohammad Rafiq. The defense called Officer Kurtis Bodner; Jim Lassen, the retired criminal investigator who had worked with the prosecuting attorney on this case; and a private investigator retained by the defense who met with both Gina and Rita.

## Additional Testimony Regarding Gina

Gina's ex-boyfriend testified for the People. He confirmed that Gina called him and asked him to pick her up the morning of November 22, 2015. She was in pain and crying hysterically. Half of her face was black and blue, and one of her eyes was so swollen you could not see the eye. Gina told him she had been raped a couple times. She told him someone had choked her with a belt, but it broke. He dropped Gina off at her aunt's house.

One of Gina's aunts testified. She saw Gina at her sister-in-law's house on November 22, 2015. Gina was very upset, crying, and having trouble getting her story out. She said a man had beat her up all night at a hotel and put a belt around her neck until it broke. She said the man had raped her. Gina's face was swollen and discolored, her eyes were swollen to the point that they were pretty much shut, and her neck had a red mark on it. Gina's aunt took her to the hospital.

Julie Langston, the nurse practitioner who conducted the sexual assault exam of Gina, testified. Gina told her defendant had hit her in the face whenever she said no to his demands. Gina told her the defendant had used a belt and his hands around her neck. Langston found bruises on Gina's body that were indicative of assault. These bruises and injuries included tenderness and bruising on Gina's back and buttocks and the back of her right arm, and bruising on Gina's face and neck. Gina's eyes were swollen, with the right eye being so swollen Langston could not get a photo with the eye open. There was an abrasion on Gina's neck, and the whites of both her eyes were bloody, which is consistent with strangulation.

Officer Rafiq authenticated the audio recording from when he interviewed Gina, and it was played for the jury. During the interview, Gina described defendant wrapping the belt around her neck, stated the belt broke, and said she put her hand between the belt and her neck. She described defendant walking around and swinging the belt.

Officer Kurtis Bodner, met with Gina at the hospital when she went to the emergency room. He had difficulty getting complete statements from Gina because she was in and out of consciousness. He noted that Gina's eyes were extremely swollen, but he could see what looked like broken blood vessels in her left eye. Gina described the defendant removing his belt and attempting to wrap it around her neck to Officer Bodner. Gina told Officer Bonder she put her hand between the belt and her neck to stop defendant from tightening it, but he kept trying to tighten the belt. The belt broke.

Jim Lassen authenticated an audio recording of an interview that he participated in, in which he and other District Attorney employees interviewed Gina regarding the case. The audio recording was played for the jury. During the interview, Gina related the events of the night she met defendant. As part of the interview, Gina described defendant putting a belt around her neck, throwing her arm up between the belt and her neck, and the belt breaking. She indicated that if she would not have put her arm between the belt and her neck, defendant would have killed her. She also said that after defendant told her to take off her clothes, he went to retrieve parts of the broken belt, and she took her clothes off because she did not want him to kill her. She said that during both times he raped her, defendant laid the belt next to them.

The private investigator hired by the defense interviewed Gina. However, the investigator was not able to obtain a full story from Gina, because Gina became hysterical and started crying during the interview. To the extent Gina told the investigator about the events of her night with defendant, it was generally consistent with what Gina testified to on the stand, including describing how at one point defendant had a belt around her neck.

### Additional Testimony Regarding Rita

Officer Mark Thrall met with Rita at the UC Davis Med Center. She had an injury below her left eye. Rita told Officer Thrall she had been at a light rail station and needed

a ride home. She told him the person who picked her up was too intoxicated to drive home, and they went and got a room at the Royal 8 Inn. She took a shower after they got to the room, and she began getting dressed while he took a shower. She had her shirt and bra on when the man came out of the shower, and he asked her why she was putting on her clothes. When she told the man she was getting ready for bed, he became upset and essentially told her that if he picked her up for nothing she needed to give him something. When Rita told the man she did not want to have sex with him, he ripped off her shirt and bra and they began fighting. She told Officer Thrall that defendant hit her in the face with his fist and with a bottle. Rita told him the black eye came from the person who hit her in the face with a fist and bottle and ripped her clothes. Rita told Officer Thrall that after the man hit her, she grabbed a pocketknife and began swinging it at him. She told Officer Thrall that once the man got off of her, she ran away and went to her uncle's place. She indicated to Officer Thrall that she had been frustrated when she went to the Hall of Justice to report the incident only to be told that the matter was not in their jurisdiction. Officer Thrall also met with defendant shortly after the date of the incident and observed defendant had three lacerations.

Officer Rafiq authenticated the audio recording from when he interviewed Rita, and the audio was played for the jury. Her account of the events has some slight variations--e.g., she said the first time he punched her they were both standing, where in other accounts she suggested she was on the bed. However, like other accounts, she describes defendant hitting her with his fist and a bottle. Additionally, she indicated she knew at least one of the hits was with the bottle, but could not tell if some others were with the bottle or his fist.

Lassen authenticated an audio recording of an interview that he participated in, in which he and other District Attorney employees interviewed Rita regarding the case. The audio recording was played for the jury. During the interview, Rita related the events of the night she met defendant. As part of her description, she said that when she refused to

10

take off her underwear, he "socked me with the bottle, of the Paul Masson bottle he had. He had the Paul Masson bottle, and he just socked me with it." She indicated that when he hit her with the bottle was when she "really felt threatened." At that point, she knew he was serious. She noted he would force her legs apart, she would try to close them, and he would force them open again. Lassen also testified that a note the People read aloud that said, "the man that tried to rape me," and "he hit me with a bottle," was one Rita confirmed during her interview with him that she had written and provided to a social worker at the hospital when she was being treated for her breathing issues.

The private investigator hired by the defense interviewed Rita. Based on the investigator's direct testimony and answers on cross examination, the general story Rita told her was consistent with the general story she told on the stand. This included a statement that defendant had hit her with a bottle after demanding she take her shirt off.

*Findings Regarding Priors and Sentencing*

The jury found defendant guilty on all seven counts arising out of events that occurred on about November 21, 2015, with Gina, and January 22, 2016, with Rita. The jury also found true that defendant used a dangerous and deadly weapon, a belt, when he committed the rapes in Counts 1 and 2, pursuant to sections 12022 or 12022.3 within the meaning of section 667.61, subdivision (e)(3).

At a bifurcated bench trial and sentencing hearing on July 14, 2017, the court found true that appellant had suffered two prior serious felony convictions pursuant to sections 667, subdivision (a), and 1170.12 subdivision, (c)(2) (strike convictions). The court also found true defendant had served two prior prison terms pursuant to 667.5, subdivision (b).

The court sentenced defendant to a total of 115 years to life consecutive to 36 years to life in prison, broken down as follows: 45 years to life, each, on Counts 1 and 2; 25 years to life on Count 5; an additional 12 years per each of aforementioned counts due

to the two strike convictions and prison priors--for a total of 36 years.  The court also imposed, but stayed pursuant to section 654, sentences of 25 years to life, each, on Counts 3, 4, 6, and 7.

Defendant filed a timely Notice of Appeal on July 17, 2017.

Additional background is provided as needed below.

## DISCUSSION

### I

### *Any Instructional Error in Defining a Dangerous Weapon Was Harmless*

Defendant argues the trial court violated his rights to due process and a fair trial by instructing the jury with a legally invalid theory.  Specifically, defendant takes the position that providing the jury with a definition of a "deadly or dangerous weapon" that included inherently "deadly or dangerous" weapons for the purposes of considering the enhancements to the Counts 1 and 2 rape charges, and determining guilt on the Counts 3 and 6 assault with a deadly weapon charges, the trial court improperly instructed the jury that it was possible to find a bottle or a belt to be inherently dangerous.  Defendant further argues that we must reverse the trial court's findings regarding the use of a deadly or dangerous weapon on these counts unless we can determine that the verdict with respect to those finding was actually based on a valid ground.  Additionally, defendant argues, with respect to Counts 1 through 3, that the record provides no basis to find the error harmless.

We agree that the trial court erred in giving instructions that included the "inherently dangerous" language.  However, we find the "harmless beyond a reasonable doubt" standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*), applies in evaluating the impact of the error.  Applying this standard, we find the error here was harmless.

A. *Additional Background*

In the jury instructions, with respect to Counts 1 and 2, the trial court included CALCRIM No. 3145: "If you find the defendant guilty of the crimes charged in Count 1 and 2, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally used a deadly or dangerous weapon during the commission of that crime. You must decide whether the People have proved this allegation for each crime, and return a separate finding for each crime.

"A deadly or dangerous weapon is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that is capable of causing and is likely to cause death or great bodily injury.

"In deciding whether an object is a deadly or dangerous weapon, consider all the surrounding circumstances, including when and where the object was possessed, and where the person who possessed the object was going, whether the object was changed from its standard form, and any other evidence that indicates that the object would be used for a dangerous rather than a harmless purpose."

The trial court provided CALCRIM No. 875 for Counts 3 and 6, which stated, "[t]he defendant is charged in Counts 3 and 6 with assault with a deadly weapon other than a firearm upon Gina Doe and Rita Doe, in violation of Penal Code section 245(a)(1).

"To prove that the defendant is guilty of this crime, the People must prove:

"One, the defendant did an act with a deadly weapon other than a firearm that, by its nature, would directly and probably result in the application of force to a person[.]"

CALCRIM No. 875 includes language that, "[a] deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

13

In providing the definitions for deadly or dangerous weapons contained in CALCRIM Nos. 3145 and 875, the trial court did not provide further definition of the terms deadly, dangerous, or inherently.

When presenting their argument regarding Counts 1 and 2, the People argued, "there's the special allegation that when he raped her, he personally used a deadly weapon or dangerous weapon, which was the belt. He never stopped using the belt. He attacked her with the belt around her neck. He kept it in his hand when he was telling her to unclothe, and, in fact, when he was raping her, she said it's still on the bed. He keeps it right there. The belt was always in play, always."

The People went into more detail regarding the belt's role as a dangerous weapon and explained how the bottle served as a dangerous weapon when making arguments regarding Counts 3 and 6: "[a]nd then the definition of a deadly or dangerous weapon is any object or instrument or weapon that is inherently deadly, or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

"Typically, you don't think of a belt as a deadly weapon, right? It has a different function. It's to keep your pants up. But if you can use it in such a way that the way you use it may cause death or great bodily injury, it's a deadly weapon. And obviously, by taking the belt and whipping it over her head and trying to pull it tight, that's using it as a dangerous and deadly weapon.

"Same thing with the bottle. The point of a bottle is to hold liquid. The point of the bottle is not to smash it over somebody's face. But if you do that, obviously, it becomes a deadly or dangerous weapon."

In their rebuttal argument, while reviewing verdict forms with the jury, the People read the space where the jury would indicate whether it found the weapon enhancement to Count 1 true or not and stated, "[a]ll that means is do you find he used a belt during the commission of this offense. If you find beyond a reasonable doubt as a jury that it is true, you put a check the 'true' box."

14

B. *The Use of The Instruction Was a Harmless Error*

In advancing his argument, defendant relies heavily on the reasoning contained in the Second District Court of Appeal's decision in *People v. Aledamat* (2018) 20 Cal.App.5th 1149, review granted July 5, 2018, S248105. Our Supreme Court has since reversed the decision in *People v. Aledamat* (2019) 8 Cal.5th 1, 4 (*Aledamat*) and we apply the reasoning stated by the Court here.

In *Aledamat*, the defendant had " 'pulled a box cutter out of his pocket and extended the blade;' " then, " 'from three or four feet away . . . thrust the blade at the [victim] at waist level, saying, "I'll kill you." [Before t]wo nearby police officers on horses intervened and arrested defendant.' " (*Aledamat*, *supra*, 8 Cal.5th at p. 4.) The People charged the *Aledamat* defendant with assault with a deadly weapon under section 245, subdivision (a)(1), and making a criminal threat under section 422. (*Ibid.*) "As to the threat charge, the People also alleged that defendant personally used a deadly and dangerous weapon. (§ 12022, subd. (b)(1).)" (*Ibid.*)

Like here on the Counts 1 and 2 enhancements, the trial court used CALCRIM No. 3145 to define a deadly or dangerous weapon for the enhancements to the threat charge, indicating " 'a deadly or dangerous weapon is any object, instrument, or weapon that is inherently dangerous, . . . or one that is used in such a way that it is capable of causing or likely to cause death or great bodily injury. In deciding whether an object is a deadly weapon, consider all of the surrounding circumstances including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose.' (See CALCRIM No. 3145.)" (*Aledamat*, *supra*, 8 Cal.5th at pp. 4-5.) Also, like here, with respect to the assault with a deadly weapon charge, the trial court used CALCRIM No. 875, and defined a deadly weapon as " 'any object, instrument, or weapon that is inherently deadly or one that is

15

used in such a way that it is capable of causing and likely to cause death or . . . great bodily injury.' " (*Id.* at p. 4.)

The jury in *Aledamat*, "convicted defendant of both counts and found the weapon allegation true." (*Aledamat*, *supra*, 8 Cal.5th at p. 5.) The defendant then appealed his conviction. (*Ibid.*) The Court of Appeal affirmed the criminal threat conviction, but it reversed the assault with a deadly weapon conviction and the true finding on the weapon allegation included with the threat charge. (*Ibid.*) In so doing, the Court of Appeal found "the trial court erroneously permitted the jury to find the box cutter to be an inherently deadly weapon" and reasoned that the error required reversal of the conviction and true finding, " ' "absent a basis in the record to find that the verdict was actually based on a valid ground," ' " which 'exists only when the jury has "*actually*" relied upon the valid theory.' ([*People v. ]Aledamat, supra,* 20 Cal.App.5th at p. 1153[, review granted].)" (*Ibid.*) Applying this standard, the Court of Appeal then found " 'no basis in the record for concluding that the jury relied on the alternative definition of "deadly weapon" (that is, the definition looking to how a noninherently dangerous weapon was actually used).' " (*Ibid.*, quoting *People v. Aledamat, supra,* 20 Cal.App.5th at p. 1154, review granted.)

Our Supreme Court agreed that the *Aledamat* trial court had erred in providing CALCRIM Nos. 875 and 3145 because, in so doing, it presented "the jury with two theories by which it could find the box cutter a deadly weapon: (1) inherently or (2) as used," because "[t]he first theory (inherently) is incorrect," even though "the second theory (as used) is correct." (*Aledamat*, *supra*, 8 Cal.5th at p. 7.)

The *Aledamat* court then considered the consequences of the trial court's instructional error to determine the nature of that error. (*Aledamat*, *supra*, 8 Cal.5th at p. 7.) In so doing, it observed there is a distinction between legally incorrect theories and factually incorrect theories. (*Ibid.*) Some theories are "factually inadequate" and others are "legally inadequate." (See *ibid.*) A theory is factually inadequate when it is incorrect only because evidence does not support it. (*Ibid.*) A " ' "legally inadequate theory," '

16

. . . is incorrect because it is contrary to law. [Citation.] An example of this second category 'is a case where the inadequate theory "fails to come within the statutory definition of the crime." ' [Citation.]" (*Ibid.*)

Applying this distinction between factually incorrect and legally incorrect theories, our Supreme Court found that the "inherently dangerous" theory as stated in the trial court in *Aledamat* was legally inadequate, because "it is contrary to law." (*Aledamat*, *supra*, 8 Cal.5th at p. 8.) The Court observed, "[c]ourts have held that a knife is not inherently deadly as a matter of law. Only a few items that are designed to be used as deadly weapons are inherently deadly. [Citations] If the court had instructed the jury on this point, the error would have been purely factual. 'But the jurors were never provided with this definition, and they could reasonably classify a box cutter, which is sharp and used for cutting, as inherently dangerous based on the common understanding of the term. This amounts to legal, rather than factual, error.' [Citation.] 'There was no failure of proof—that is, a failure to show through evidence that the box cutter is an "inherently dangerous" weapon. Instead, a box cutter cannot be an inherently deadly weapon "as a matter of law." ' [Citation.] Because the trial court here did not define what 'inherently deadly' meant, the jury would not be equipped to know that, contrary to what the instruction suggested, a box cutter is *not* an inherently deadly weapon." (*Ibid.*)

Having agreed with the Court of Appeal that giving CALCRIM Nos. 875 and 3145 with the "inherently dangerous" language was a legal error, the Court then considered whether that error was harmless, and therefore, one that did not require reversal, and what standard to apply in determining harmlessness. (*Aledamat*, *supra*, 8 Cal.5th at pp. 8 & 13.) While the Court of Appeal had concluded, like defendant argues here, that the "error requires reversal unless there is a basis in the record to find that 'the jury has "*actually*" relied upon the valid theory,' " the Court disagreed. (*Id.* at p. 9.) Instead, the Court concluded "the usual 'beyond a reasonable doubt' standard of review established in *Chapman*[, *supra,*] 386 U.S. [at page 24] for federal constitutional

17

error applies." (*Id.* at p. 3.) Under this standard, the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) Applying the different standard to the record in *Aledamat*, the Court found the error was harmless in context and reversed the Court of Appeal's decision. (*Id.* at p. 15.)

Here, as in *Aledamat*, in providing the jury with CALCRIM Nos. 875 and 3145, and therefore including language that suggested it might be possible for the jury to find the belt and bottle are inherently dangerous weapons, the trial court made a legal error. However, on the record, we find beyond a reasonable doubt that the error was harmless.

As a preliminary matter, common sense dictates that, even if the jury did apply a non-legal definition of "inherently dangerous," to determine if the belt and bottle were dangerous weapons, the jury would not have concluded a belt or bottle is an *inherently* dangerous weapon. Moreover, any possible confusion as to whether belts and bottles are inherently dangerous would have been cured during closing arguments, when the People specifically observed that belts and bottles are not typically used as weapons. The People noted that, on the contrary, belts and bottles both have inherently non-dangerous everyday uses: belts hold up pants and bottles hold liquid. Here, the objects were converted from their ordinary nature by the way defendant used them. As Gina testified, and numerous witnesses gave testimony indicating her story on this point had remained consistent, defendant took an ordinary belt and wrapped it around her neck and attempted to choke her with it, a particularly dangerous use that caused her injury and to fear for her life.

Similarly, Rita testified, and numerous witnesses gave testimony indicating her story on this point had remained consistent, that defendant took an ordinary bottle and hit her in the face with it, which contributed to injuries on her face. There is no reasonable doubt that the jury would have found the defendant used deadly and dangerous weapons

18

even if the trial court only defined "deadly and dangerous weapon" to mean an object used "in such a way that it is capable of causing and likely to cause death or great bodily injury." Here, the evidence was that defendant took everyday objects and used them in a particularly dangerous manner that could--and did--cause injuries.

Defendant cites to the People's rebuttal statement that the jury should check the "true" box on the Counts 1 and 2 enhancements if it found he used the belt on Gina and claims it was an improper argument that encouraged the jury to rely on an improper theory, and somehow exacerbated the impact of the error in providing CALCRIM Nos. 875 and 3415. This argument takes those statements out of context and ignores both (1) that the People had already clarified that belts and bottles are not typically considered dangerous weapons but were rendered dangerous weapons in the way they were used here, and (2) that, in light of the testimony provided, if the jury accepted the belt and bottle were used, they accepted that defendant placed the belt around Gina's neck and pulled it tight until it broke, and he struck Rita in her face with the bottle, and reason dictates both those actions are likely to cause death or serious injury. Defendant also argues that the instruction was particularly prejudicial as to Rita, because her testimony as to whether he hit her with the bottle was vague. Specifically, he points to her testimony where she says, "I don't know, maybe because [I] felt it a little more. But I seen him drinking--I seen the alcohol, and I seen him swing--I seen the bottle in his hand and he swung his hand" and later indicated "it was a whole lot more sharper." This argument is also misplaced. Any possible doubt created by this testimony about the use of the bottle--and the jury was given sufficient evidence to find defendant hit Rita with a bottle--would have gone to the issue of if he used the bottle at all, and not to the issue of if the alleged way he used it converted it to a dangerous weapon.

II

*The Trial Court Did Not Need to Include a Simple Assault Count with Count 6*

Defendant argues that the trial court violated his Fourteenth Amendment right to due process when it failed to instruct the jury on the lesser included offense of simple assault for Count 6, assault with a deadly weapon. This argument is not persuasive.

A. *Additional Procedural Background*

On Counts 1 and 2 (rape), the court included a lesser included offense instruction, CALCRIM No. 960 for simple battery. On Counts 4 and 7 (assault with force likely to cause great bodily injury), and on Count 5 (attempted rape), it included the lesser offense instruction CALCRIM No. 961 for simple assault. The court did not provide an instruction for a lesser included offense of simple battery or assault on Counts 3 and 6 (assault with a deadly weapon).

When reviewing the instructions, the People stated, "[d]efense counsel elected a number of lesser-included crimes, specifically the misdemeanor battery as to Counts I and 2, and misdemeanor assault as to counts -- make sure I get them right -- 3, 5, and 6, I believe. At any rate, the lesser included crimes have been included in the packet for the ones the defense requested." Defense counsel confirmed, "[t]he lessers I had requested and are included are what I would like. . . . The lessers that have been given were the ones that I requested, and I felt the evidence supported."

On the record, but outside the presence of the jury, the parties and court discussed the verdict forms, and the court noted, "as to Count 6, we deleted the lesser. It was an error."

20

B.  *Applicable Law*

Simple assault is a lesser included offense of assault with a deadly weapon. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 747.)

" ' "[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*.' [Citation.]" [Citations.]' ([*People v.*] *Castaneda* [(2011)] 51 Cal.4th [1292,] 1327, italics added.) 'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.' (*People v. Wilson* (1992) 3 Cal.4th 926, 941 [].)  ' "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense  . . . ." [Citation.]  Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense.  [Citation.] " ' "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." ' "  [Citation.]' (*People v. Valdez* [(2014)] 32 Cal.4th [73,]116, fn. omitted.)"  (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.)  " 'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.'  [Citation.]"  (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

C.  *Substantial Evidence Did Not Support Giving the Lesser Included Instruction for Count 6*

Defendant argues that Rita was unclear as to if defendant actually hit her with a bottle when he assaulted her and that, therefore, the trial court needed to instruct on the lesser included offense of simple assault.  We disagree.

While some of the language Rita used when taken out of context might have suggested she had some doubts--e.g., she said, "I don't know if--I mean, it had to be bottle because I wasn't--so I don't know what--because" --when pressed on the specifics

21

as to why she thought it was the bottle she provided details that made her response far more concrete. She indicated she "saw the bottle in his hand" and then he "swung his hand" at her; that "right after" he took a drink from the bottle he hit her "right in the face"; and "[y]ou could feel the intensity of the bottle just hit me. You could feel it." Moreover, Rita's representation that defendant hit her with a bottle was consistent with what she told investigators that testified at trial. Though Rita's testimony may have been less than perfectly articulate, when reviewed, the fact that her testimony was he hit her with the bottle becomes inescapable: in rapid succession she saw the bottle was in his hand, she saw the hand holding the bottle swing at her, and then she felt something that felt like a bottle hit her face. There was no testimony elicited from her that she thought he might have hit her with anything but the bottle that could have caused the same sensation, and there was no indication that he had any time to put the bottle down between taking a drink and slamming her in the face by swinging the arm that held the bottle. Taken together, there is no substantial evidence the jury would have found persuasive an argument that defendant was guilty of the lesser included offense but not of assault with a deadly weapon.

Defendant argues the discussions between the parties and the court--where the People stated they believed the lesser included offenses were on Counts 3, 5, and 6-- indicate the lesser included was supposed to be offered and its omission is a mistake. However, based on the record, it appears more likely the People were mistaken in guessing the count numbers, and would have identified Counts 4, 5, and 7 if they had been looking at the relevant instruction pages when speaking.

## III

*The Use of the Sexual Assault Propensity Instruction Did Not Violate Defendant's Rights*

Defendant argues the trial court violated his United States Constitutional Fourteenth Amendment right to due process by allowing the jury to consider the Gina

Doe case in finding that he was inclined and predisposed to commit sexual offenses, and, therefore, likely to and did attempt to rape Rita Doe.

A. *Additional Procedural Background*

As part of his motions in limine, defendant requested the court not instruct the jury with CALCRIM No. 1191, an "Evidence Code [s]ection 1108" instruction. The trial court elected to use CALCRIM No. 1191B, and instructed the jury that "[i]f the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

In closing argument, the People discussed the use propensity evidence and the related instruction specifically: "[t]he other special circumstance jury instruction is 1191. . . . This is another special one, and this has to do with the sex crimes. Same idea. That if you find that the defendant is guilty of one or the other of the rapes of Gina or the assault to commit rape of Rita, you can use that as evidence in the other ones.

"And this is propensity evidence . . . . This means if you find that he raped Gina beyond a reasonable doubt, you can find that he is inclined and predisposed to rape. That he's a rapist and that's what he's trying to do with Rita. You can use it directly like that. The only thing with the evidence is that you have to find already that he committed one of these beyond a reasonable doubt before you use it as a crossover, okay?" The People then reread the instruction regarding propensity evidence to the jury.

B.  *CALCRIM No. 1191B Is Constitutional*

Under Evidence Code section 1101, subdivision (a), "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  Though Evidence Code section 1101, subdivision (b), clarifies that nothing in the section, "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented)," it provides that the admission of such evidence if still prohibited to prove a defendant's "disposition to commit such an act."  Evidence Code section 1108, subdivision (a), provides an exception to the prohibitions contained in Evidence Code section 1101, and allows that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

In *People v. Falsetta* (1991) 21 Cal.4th 903, 907 (*Falsetta*), our Supreme Court found that Evidence Code section 1108 is constitutionally valid and survived the defendant's due process challenge.  The Court reasoned that Evidence Code "section 352 provides a safeguard that strongly supports the constitutionality of [Evidence Code] section 1108.  By reason of section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under section 352." (*Id.* at pp. 916-917.)

Defendant acknowledges the holding of *Falsetta*, but asks us to "re-examine" it, arguing that the substantial protections the *Falsetta* court assumed existed from the use of Evidence Code section 352 have proven to be nothing more than "gossamer dreams." Recently, our Supreme Court was faced with a similar request in *People v. Baker* (2021) 10 Cal.5th 1044, 1089-1090, and found "no persuasive reason to revisit *Falsetta*." Accordingly, we also decline defendant's request to reconsider *Falsetta* even if we were free to do so.

Although the argument is undeveloped, defendant also appears to argue that it was inappropriate to allow the jury to consider the charged offenses against either victim as Evidence Code section 1108 propensity evidence. This success of this argument is forestalled by the California Supreme Court's holding in *People v. Villatoro* (2012) 54 Cal.4th 1152, 1164.

IV

*Impact of Amendments to Sentencing Laws*

Defendant argues we should remand this matter for the limited purpose of allowing the trial court to decide if it will exercise discretion to strike the enhancements imposed due to his prior strike convictions in light of amendments to sentencing laws made by Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1, 2) (SB 1393) after the trial court entered its judgment. As indicated above, the prior serious felony sentencing enhancements comprise 30 years of defendant's sentence. We agree that the change to the sentencing law apply in this case. However, with respect to the 30 years imposed due to the prior strike convictions, the record demonstrates the trial court would not have exercised its discretion to strike those enhancements had it been given the discretion to do so at the time of sentencing.

In supplemental briefing, defendant argues that further amendments made to the sentencing law by Senate Bill No. 136 (Stats. 2019, ch. 590) (SB 136) require us to strike

the six years of enhancements imposed due the trial court's finding that he had two prison priors pursuant to section 677.5, subdivision (b). We agree and strike the six-year enhancement imposed for the prison priors.

A. *Additional Background*

In considering defendant's requests, it is appropriate to consider some of the statements and decisions made by the trial court at the sentencing hearing and to further break down how defendant's sentence enhancements due to the two prior strike convictions and two prison prior findings were computed.

Before the court issued its sentence, the defense made a motion pursuant to section 1385, subdivision (a), to dismiss defendant's two prior strike convictions. While the court acknowledged that it had the "discretion under Penal Code section 1385" to dismiss those prior convictions, the court denied the request. In denying the motion the court considered, "the defendant's significant criminal background. The fact that he was on parole when this offense took place. Taking into consideration that he's not been free from custody for any extended period of time. And . . . while . . . in his criminal history background there are no sexual assault cases, there are serious, violent felonies, and he appears to be the exact type of individual that falls within the three strikes law. ¶ It would not be appropriate for this court to exercise its discretion to strike either of the prior strikes under that set of circumstances."

Additionally, before pronouncing its sentence, the court looked to circumstances in aggravation and mitigation as articulated in California Rules of Court, rules 4.421 and 4.423. With respect to circumstances in aggravation, the court observed, "the offenses involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. The defendant was armed in the commission [of] the offenses. . . . ¶ The manner in which the offenses were carried out did indicate some planning and some sophistication. ¶ He was engaged

26

in violent conduct [which] indicates he's a serious threat to society. ¶ The defendant's convictions are numerous. ¶ He served prior prison terms. ¶ In addition, defendant was on parole when he committed the crimes." In contrast, when looking at possible circumstances in mitigation, the court observed, "I don't find there to be any circumstances in mitigation, pursuant to Rule 4.423."

In computing the sentence, due to the two prior strikes, base sentences of 15 years for Counts 1 and 2 were tripled, pursuant to section 667, subdivision (e)(2)(A)(i); and a 25-year sentence was imposed for Count 5 pursuant to section 667, subdivision (e)(2)(A)(ii). Also, the additional 12 years applied to Counts 1, 2, and 5 for the strike convictions and prison priors can be broken down to include (1) a five-year sentence for each of the two strike convictions pursuant to section 667, subdivision (a)(1); and (2) a one-year sentence each for the two prison priors pursuant to then section 667.5, subdivision (b).

B. *SB 1393 Applies, But We Need Not Remand On This Record*

Section 667, subdivision (a)(1), adds a five-year sentencing enhancement to a sentence for a serious felony when the defendant, "previously has been convicted of a serious felony in this state." Section 1385, subdivision (a), permits a court to "either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." Section 1385, subdivision (b), gives courts the option to, "strike the additional punishment for [an] enhancement in the furtherance of justice" when it otherwise "has the authority pursuant to subdivision (a) to strike or dismiss an enhancement."

Prior to 2019, section 1385 stated trial courts had no authority "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (See § 1385, subd. (b) (2018).) "Senate Bill 1393," which was enacted after judgment was entered below, "removed this prohibition. (Stats. 2018, ch. 1013, §§ 1, 2.)

27

The legislation became effective January 1, 2019. (Cal. Const., art. IV, § 8, subd. (c).)" (*People v. Jones* (2019) 32 Cal.App.5th 267, 272 (*Jones II*).)

As articulated by our Supreme Court in *In re Estrada* (1965) 63 Cal.2d 740, 742, when a statute is amended that mitigates a punishment after the prohibited act is committed but before final judgment, the "punishment provided by the amendatory act should be imposed." In *People v. Francis* (1969) 71 Cal.2d 66, 76, our Supreme Court applied *Estrada* to circumstances in which "the amendment does not revoke one penalty and provide for a lesser one but rather vests in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty." In *Francis*, our Supreme Court also clarified that an amended penalty statute applies in instances in which the amendment occurred after sentencing in the trial court but before the case was resolved on appeal. (*Id.* at p. 77.)

When the Legislature "enacted Senate Bill 1393," amending section 1385, "the Legislature did not indicate it intended the legislation to apply prospectively only. (*Estrada*, [*supra*, 63 Cal.2d] at p. 742; [*People v.*] *Garcia* [(2018) 28 Cal.App.5th 961,] 972, [].) The act thus applies retroactively to this case." (*Jones II*, *supra*, 32 Cal.App.5th at p. 272.)

A finding that amended sentencing provisions apply retroactively, "is not the end of the matter. We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [].)" (*Jones II*, *supra*, 32 Cal.App.5th at pp. 272-273.) In considering the trial court record, "[t]he trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id.* at p. 273.)

28

Here, the trial court's statements when considering the request to strike the prior serious felony make it clear it would not have stricken the section 667, subdivision (a)(1), enhancement had it been given the opportunity. The trial court observed these crimes were part of an ongoing pattern of criminally violent behavior. Similarly, the court characterized the defendant as a serious threat to society and as having numerous convictions when evaluating possible aggravating factors to consider when imposing a sentence. Based on this record, remanding this matter to allow the trial court to exercise its discretion under the amended versions of sections 667 and 1385 would be a waste of judicial and other resources.

Defendant argues we ought not consider the trial court's decision on the section 1385 motion to strike in determining if remand is appropriate here, because there are specific standards courts apply in ruling on section 1385 motions that would not be used here. However, the decision on the motion to strike is only one of many signals the trial court gave that it would not be inclined to exercise leniency in determining the term of defendant's sentence and, when considered with the other decisions and statements made by the court during sentencing, it is clear the court would not have stuck the 30-year portion of the sentence imposed due to the prior serious felonies had it been given the opportunity.

C. *SB 136 Applies and We Strike the Six-Year Portion of the Sentence the Trial Court Imposed Due to the Prison Priors*

While this appeal was pending, SB 136 went into effect. That bill changed the grounds for imposing a sentence for prison priors. Defendant contends, and the Attorney General agrees, that his priors no longer qualify for punishment under SB 136. We agree.

As a preliminary matter, the two one-year enhancements applied for the two prison priors should only have been applied once under the law at the time sentencing was imposed, which would have made the time added for the two prison priors two years

instead of six years. (See *People v. Edwards* (2011) 195 Cal.App.4th 1051, 1060 [prior prison term enhancements are status enhancements that can be imposed only once on the aggregate sentence], citing *People v. Williams* (2004) 34 Cal.4th 397, 402.) Because we strike all enhancements due to amendments made to the law after the court entered its judgment below, we need not further revise the sentence to address this error.

When defendant was sentenced, section 667.5, subdivision (b) provided for a one-year enhancement for each prior prison term served for "any felony," with a limited exception. Under SB 136, however, a trial court may impose the one-year enhancement only when the prior prison term was served for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.)

Defendant has not served a prior prison term for a sexually violent offense. Each of his priors was for burglary pursuant to section 459. SB 136 became effective January 1, 2020. (Cal. Const., art. IV, § 8, subd. (c)(2).) Defendant's convictions were not final by that date because this appeal was still pending. Because the new law mitigates punishment and there is no saving clause, it operates retroactively. (See *People v. Brown* (2012) 54 Cal.4th 314, 323-324; *In re Estrada, supra,* 63 Cal.2d at p. 748.) A remand for resentencing is unnecessary as the trial court already imposed the maximum sentence available. (*People v. Hill* (1986) 185 Cal.App.3d 831, 834.) We thus strike the enhancements imposed under section 667.5, subdivision (b).

## DISPOSITION

Defendant's sentencing enhancements totaling six years under former Penal Code section 667.5, subdivision (b) are stricken. In all other respects, the judgment is affirmed.

30

The clerk of the trial court shall prepare a revised abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


                                            _____

                                            HULL, J.


I concur:


_____

BLEASE, Acting P. J.

Duarte, J., Dissenting.

I respectfully dissent from the majority's decision to decline to remand defendant's case to allow the trial court to consider its newly conferred discretion to strike one or both of defendant's two Penal Code section 667, subdivision (a) serious felony enhancements pursuant to Senate Bill No. 1393 (2017-2018 Reg. Sess.).[1] These enhancements increased defendant's sentence by 30 years, and the trial court had no choice but to impose them at sentencing. I do not think it is appropriate for us to conclude in the first instance that the court would have declined to adjust defendant's sentence, based on *other* rulings and considerations evidenced by the record at sentencing which had no relation to a decision to increase defendant's sentence by 30 years.

As a general rule, remand is *required*; the exception to that rule is where the record shows the trial court clearly indicated at the original sentencing that it would not strike the enhancement, even if it had the discretion to do so. (*People v. Franks* (2019) 35 Cal.App.5th 883, 892; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) Although the majority concludes the trial court already considered the relevant factors in its analyses of defendant's motion to dismiss his prior strike and the aggravating and mitigating factors of his case, and thus the court has already indicated how it would rule such that remand is unwarranted, I disagree.

Also important to note here is that the trial court had *no* discretion in sentencing on this particular case, other than its denial of defendant's motion to dismiss his prior strikes, which I discuss *post*. Section 667.61, subdivisions (b), (c)(1), and (e)(3), mandate a base sentence of 15 years to life on a person guilty of rape under section 261, subdivision (a)(2), as defendant was convicted of here. Section 667, subdivision (e)(2)(A)(i) dictates that base sentence be tripled, assuming the resulting time is greater than other possible sentencing terms described in subdivision (e)(2)(A). For each of the rape counts, the court imposed this 45-year term. Similarly, while section 220,

---

[1] Further undesignated references are to the Penal Code.

1

subdivision (a)(1), provides a range of possible sentences for attempted rape of a person over 18 with a maximum of six years, section 667, subdivision (e)(2)(A)(ii) dictates a 25-year term for attempted rape count in this instance. The enhancements due to the strikes and prison priors were also dictated by statute, although the court did err in computing the prior prison term enhancements. (See § 667, subd. (a); see also § 667.5, subd. (b) (2018).)

Under the analysis in *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, in deciding whether to dismiss a prior strike allegation, a trial court must determine whether defendant should properly be deemed outside the spirit of the three strikes law. (See *People v. Williams* (1998) 17 Cal.4th 148, 161.) In the application of the discretion conferred by Senate Bill No. 1393, in contrast, the role of the trial court is to "evaluate[] all relevant circumstances to ensure the punishment fits the offense and the offender." (*People v. Shaw* (2020) 56 Cal.App.5th 582, 587.) These are very different analyses with different considerations. In the context of deciding a *Romero* motion, the trial court need not consider the underlying offense or offenses and the appropriate sentence therefor; the analysis concerns only the *offender*, and whether they fall within the spirit of the three strikes law, which is a tool for punishing those offenders with recidivist tendencies more harshly than non-recidivist offenders. The decision to decline to find defendant outside the heartland of recidivist offenders is not a decision about the propriety of the sentence he or she will face as a consequence of inclusion in or removal from that heartland.

Accordingly, I disagree that the *Romero* motion's denial, even when considered with the trial court's statements regarding aggravating factors, was necessarily a signal of that court's unspoken conclusion that the ultimate sentence was a considered product of the aggregate sentence it felt was needed for defendant to achieve a level of rehabilitation and at the same time protect the community. I do not see that the decision to deny the motion was necessarily an endorsement of the resulting sentence as a sentence that would ensure the punishment fits the offense and the offender. (See *People v. Shaw, supra,* 56 Cal.App.5th at p. 588.)

2

Finally, the passage of Senate Bill No. 1393 signaled a willingness by the Legislature to confer new discretion on trial courts. "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*In re Estrada* (1965) 63 Cal. 2d 740, 745.) The trial court could not have considered this willingness here, because it was not yet evidenced by the passage of the bill, and the subject did not come up at sentencing.

In my view, the trial court's sentencing decision was what it purported to be: a finding about the offender himself, made with no consideration of the then-absent discretion conferred by Senate Bill No. 1393 and its underlying policy message. For the reasons expressed herein, I would remand and give the trial court the opportunity to consider its new discretion.


_____

DUARTE, J.

3